NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0703-14T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

AMBOY NATIONAL BANK
ACCOUNT NUMBER
XXX-XXXX-2 VALUED AT FOUR
HUNDRED THIRTY-SIX THOUSAND
EIGHT HUNDRED FORTY-FIVE
DOLLARS and EIGHTY-SIX CENTS
IN UNITED STATES CURRENCY,
AMBOY NATIONAL BANK ACCOUNT
NUMBER XXX-XXXX-4 VALUED AT
THREE HUNDRED EIGHTY-TWO
THOUSAND THREE HUNDRED
NINETY-EIGHT DOLLARS AND
FOURTEEN CENTS IN UNITED
STATES CURRENCY, AMBOY NATIONAL
BANK ACCOUNT XXX-XXXX-5 VALUED
AT SEVENTEEN THOUSAND NINE HUNDRED
FIFTY DOLLARS AND FOURTEEN CENTS
IN UNITED STATES CURRENCY, and
EIGHT THOUSAND EIGHT HUNDRED
FORTY-FIVE DOLLARS IN UNITED
STATES CURRENCY,

    Defendants.

| APPROVED FOR PUBLICATION |
| :---: |
| August 26, 2016 |
| APPELLATE DIVISION |

_____

Argued September 22, 2015 — Decided August 26, 2016

Before Judges Fisher, Espinosa and Rothstadt.

On appeal from Superior Court of New Jersey, Law Division, Monmouth County, Docket No. L-5279-10.

Ralph P. Ferrara argued the cause for appellants John R. Bovery, Jr. and Mary Bovery (Ferrara Law Group, P.C., attorneys; Mr. Ferrara and Joshua H. Beisler, on the brief).

Carey J. Huff, Special Deputy Attorney General/Acting Assistant Prosecutor argued the cause for respondent (Christopher J. Gramiccioni, Acting Monmouth County Prosecutor, attorney; Ms. Huff and David M. Fritch, Special Deputy Attorney General/ Acting Assistant Prosecutor, of counsel and on the brief).

The opinion of this court is delivered by Espinosa, J.A.D.

This is an appeal from a civil forfeiture action. John R. Bovery, Jr. (Bovery) organized sports pools for approximately twenty years before he came under scrutiny by investigators. In September 2010, the State obtained an order to restrain and seize the contents of three bank accounts at Amboy National Bank and a search warrant for Bovery's residence. Approximately $846,000 was seized following execution of the order, search warrant and Bovery's arrest. In challenging the forfeiture action, Bovery admitted operating the sports pools and that $722,000 of the money seized represented "entry fees" he received from players but denied the pools were illegal.

Bovery and his wife, Mary Bovery (collectively, claimants), appeal from orders that granted the State's motion for summary

A-0703-14T2

judgment affirming the seizure, and denied their motion to segregate players' money.[1] We affirm.

## I.

The facts are largely undisputed. Bovery became the target of a criminal investigation after admitting his activities to detectives of the Monmouth County Prosecutor's Office in May 2010. Primarily, Bovery organized football survival pools but he also organized baseball, golf, and basketball pools. There were from one hundred to several thousand participants in the pools who paid entry fees ranging from $20 to $100. During the 2009 to 2010 "pool cycle," Bovery collected just over $1.7 million in pool entry fees.

Initially, Bovery deposited the entry fees into his own bank accounts. As the operation grew, Bovery opened joint

---

[1] Claimants' case information statement identifies the denial of their motion for reconsideration as an issue raised on appeal. However, this issue was addressed for the first time in their reply brief. Because this issue was not presented in claimants' merits brief, it is deemed waived. See Gormley v. Wood-El, 218 N.J. 72, 95 n.8 (2014); Drinker Biddle & Reath LLP v. N.J. Dept. of Law & Public Safety, 421 N.J. Super. 489, 496 n.5 (App. Div. 2011) (claims not addressed in merits brief deemed abandoned, and could not properly be raised in a reply brief); see also Pressler and Verniero, Current N.J. Court Rules, comment 4 on R. 2:6-2 (2016).

accounts with his father[2] because he believed his children would be unable to obtain financial aid for college if he had to disclose the value of his pool-related assets. Bovery testified he always put the entry fees into the two accounts he held jointly with his father because he "didn't want any lunatic to think [he] had cash under the mattress."

Bovery stated the money he obtained from running the pools was "the money I live on now actually," amounting to approximately $110,000 per year. He described the funds he received from pool participants as "'optional' gifts, . . . sometimes from the winners and sometimes from the players in general." He emphasized that these gifts were "always at the discretion of the players and/or winners."

In 2009, Bovery began using a third-party website to organize the pools. On his own website, he discussed at some length the topic of gift pledges and how players were to make such pledges. In one posting from August 2009,[3] he described changes he made to the procedures and explained he imposed a 10%

---

[2] Bovery's father was not involved in the sports pools and had requested that his name be removed from the bank accounts. He was dismissed from the case by consent order in April 2014.

[3] In a posting from August 2010, Bovery referred players to this August 2009 post and one from August 2007 to describe the manner in which he operated the pools.

maximum on the gifts he would accept.[4] He noted, "[h]istorically, the winners of my pools have been very generous with their gifts to me and my family and I have no complaints; if I did, I would have stopped running these pools years ago." He said he had "just 4 problems over 19 years who gifted less than 10%." After instructing players on how to fill in the fields on the website to make their pledges, he stated, "if you put a number lower than 10[%] it will be your way of showing me that you do not share my view on compensating pool managers." He also told players that if they disagreed with gifting him 10%, "I strongly suggest you not participate in any of my pools, it will simply help us both to avoid a very ugly situation somewhere down the road." In an email, Bovery described his contingency plan for dealing with winners who failed to "gift" the 10%, that he would advise them they would receive a 1099, which would result in their winnings being taxed.

Bovery did not report the "gifts" he received as income to federal or state taxing authorities during the decades he

_____

[4] During the course of his testimony, Bovery stated that he "understood the ten percent" from growing up in Jersey City, where he knew "which shoemaker or which butcher was taking the numbers." He said, "That's the way I grew up. I understood bookkeeping, betting. I understood how it worked, right, you know and take care of people with ten percent."

operated the pools and did not report any of the payments made to pool winners to state or federal taxing authorities.

After the detectives' initial interviews, two of the bank accounts were subpoenaed and periodically checked. The accounts were seized on the first day of the football season before the start of any game. A detective testified the prosecutor's office waited to obtain and execute the search warrants because they "wanted to have as much evidence as possible."

Accounts number XXX-XXXX-2 (Account -2) and XXX-XXXX-4 (Account -4) were joint accounts in the names of Bovery and his father. Account number XXX-XXXX-5 (Account -5) was a joint account with Bovery's wife. According to Bovery, "[a]ll [three] accounts were used to varying degrees for pool-related purposes." Account -2 and Account -4 were "primarily used for pool-related purposes," while Account -5 was "primarily used for personal purposes."

The deadlines for pool participants to remit entry fees to participate in his sports pools for the 2010/11 National Football League season ranged from September 4 to 19, 2010. It is undisputed[5] that in August and September 2010, Bovery

---

[5] The facts regarding these deposits were set forth in the Statement of Undisputed Facts submitted by the State in support of its motion for summary judgment and were not disputed by claimants pursuant to Rule 4:46-2(b).

deposited checks and money orders payable to him as entry fees and totaling over $617,000 as follows:

Deposits to Account -2

| 8/24/10 | $28,205 |
| | $28,765 |
| | $18,345 |
| 8/25/10 | $28,350 |
| | $22,240 |
| 8/26/10 | $17,420 |
| 8/27/10 | $27,955 |
| 8/30/10 | $36,220 |
| 9/7/10 | $36,800 |
| | $47,190 |
| | $43,165 |

Deposits to Account -4

| 8/24/10 | $22,210 |
| | $32,275 |
| | $16,800 |
| 8/25/10 | $21,930 |
| | $39,255 |
| 8/26/10 | $18,640 |
| | $25,535 |
| 8/30/10 | $27,985 |
| 9/7/10 | $29,630 |
| | $48,105 (96 checks and money orders) |

At the time of the seizure the accounts from which the money was seized were the only bank accounts held by claimants. As Bovery admitted, Account -5 was also used for the deposit of

entry fees, although to a lesser degree. By way of example, he testified that eight checks totaling $1500 deposited into that account in February 2009 were entry fees from "late payers."

When the warrants were executed on September 9, 2010, $837,194.14 was seized from the bank accounts: $436,845.86 from Account -2; $382,398.14 from Account -4; and $17,950.14 from Account -5. In addition, $8510 in cash was seized from Bovery's home and $335 was seized from Bovery's wallet incident to his arrest. It is undisputed that the cash seized from Bovery's home was withdrawn from Account -5. Of the $846,000 seized, players' entry fees accounted for $722,000; $124,000 were the Boverys' personal funds.

On October 20, 2010, the State commenced an action pursuant to N.J.S.A. 2C:64-1 for forfeiture of the contents of the three bank accounts as well as the cash seized from the Bovery residence, alleging that all the money was used or intended to be used in the commission of criminal activity.[6] Claimants were served with copies of the verified complaint.

---

[6] Bovery was indicted for: third-degree promotion of gambling, N.J.S.A. 2C:37-2 and N.J.S.A. 2C:2-6; and first-degree financial facilitation of a crime, N.J.S.A. 2C:21-25 and N.J.S.A. 2C:2-6. A motion to dismiss the indictment was denied in February 2012. According to Promis/Gavel, Bovery was subsequently admitted to the pretrial intervention program.

Claimants moved to separate player money, arguing the State's failure to notify any players of the seizure violated the notice provision of the forfeiture statute, N.J.S.A. 2C:64-3(c), and therefore, the players' money should have been separated from Bovery's personal money. Following oral argument, the trial judge denied claimants' motion, citing a lack of standing.[7]

The State moved for summary judgment, contending the funds seized were subject to forfeiture pursuant to N.J.S.A. 2C:64-1(a) because Bovery illegally operated and accepted proceeds from various sports pools. Claimants cross-moved for summary judgment. Claimants did not deny Bovery's role in the pool organization or that he accepted remuneration from players. They argued the seized money was not used in furtherance of unlawful activity because the pools did not constitute illegal gambling. The trial judge granted the State's motion and denied claimants' motion, setting forth his reasons in a written opinion. Claimants' motion for reconsideration was denied.

In their appeal, claimants argue the trial judge erred in granting summary judgment to the State because there were

---

[7] No written order memorializing the oral decision is included in the record on appeal, and claimants state "[u]pon information and belief, no written [o]rder was prepared denying the [m]otion."

material issues of fact (Point I). Specifically, as to the $124,000 described as Bovery's personal funds, claimants argue that a material issue of fact existed because in determining these funds were subject to forfeiture, the trial court failed to account for W-2 money deposited into the account. Claimants further argue a material issue of fact barred summary judgment because the State failed to establish the requirements of N.J.S.A. 2C:37-2(b)(1). Claimants also contend Bovery's acceptance of "gifts" from the players did not amount to accepting bets from them and that the trial court erred in holding Bovery materially aided an unlawful gambling enterprise because he never accepted a bet. Claimants argue further that the trial court erred in "ruling the State's seizure of player money did not violate the notice provision of the civil forfeiture statute" (Point II). Finally, claimants argue summary judgment should not have been granted because the seizure of accounts here exemplifies the potential for abuse in the forfeiture statute. (Point III). We are unpersuaded by these arguments and, further, find the argument raised in Point III lacks sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

A-0703-14T2

In reviewing the summary judgment order, we view the facts "in the light most favorable to" the claimants to determine "if there is a genuine issue as to any material fact or whether the moving party is entitled to judgment as a matter of law." Rowe v. Mazel Thirty, LLC, 209 N.J. 35, 38, 41 (2012) (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 529 (1995)). We review questions of law de novo, State v. Gandhi, 201 N.J. 161, 176 (2010), and need not accept the trial court's conclusions of law. Davis v. Devereux Found., 209 N.J. 269, 286 (2012).

To defeat a motion for summary judgment, the opponent must "'come forward with evidence' that creates a genuine issue of material fact." Horizon Blue Cross Blue Shield of N.J. v. State, 425 N.J. Super. 1, 32 (App. Div.) (quoting Brill, supra, 142 N.J. at 529), certif. denied, 211 N.J. 608 (2012); see R. 4:46-2(c). "An issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact." R. 4:46-2(c).

"Competent opposition requires 'competent evidential material' beyond mere 'speculation' and 'fanciful arguments.'" Hoffman v. Asseenontv.Com, Inc., 404 N.J. Super. 415, 426 (App.

Div. 2009) (citation omitted). "[B]are conclusions in the pleadings without factual support in tendered affidavits, will not defeat a meritorious application for summary judgment." Brae Asset Fund, L.P. v. Newman, 327 N.J. Super. 129, 134 (App. Div. 1999) (citation omitted); see also Puder v. Buechel, 183 N.J. 428, 440-41 (2005) ("[C]onclusory and self-serving assertions by one of the parties are insufficient to overcome the motion."); Cortez v. Gindhart, 435 N.J. Super. 589, 605-06 (App. Div. 2014), certif. denied, 220 N.J. 269 (2015).

## III.

We begin by reviewing the forfeiture statute, acknowledging that "[f]orfeiture statutes are generally disfavored in the law," State v. Seven Thousand Dollars, 136 N.J. 223, 238 (1994), and are "strictly construed against the State." State v. One House, 346 N.J. Super. 247, 252 (App. Div. 2001); see also State v. 1979 Pontiac Trans Am, 98 N.J. 474, 481 (1985). "The theory of forfeiture is based on the misuse of the property rather than resulting from the commission of an offense by its owner or user." Seven Thousand Dollars, supra, 136 N.J. at 233 (citation omitted). Accordingly, a civil forfeiture action is brought as an in rem proceeding against the property rather than as an action against the owner of the property. Id. at 232-33.

N.J.S.A. 2C:64-1 to -9 authorizes civil forfeiture for two categories of property.

The first category is designated prima facie contraband and consists of "[c]ontrolled dangerous substances, firearms which are unlawfully possessed, carried, acquired or used, illegally possessed gambling devices, untaxed . . . cigarettes . . . [and] untaxed special fuel." N.J.S.A. 2C:64-1(a)(1). Prima facie contraband is automatically forfeited once seized by the State. Seven Thousand Dollars, supra, 136 N.J. at 233 (citing N.J.S.A. 2C:64-2).

The money seized here falls into the second category of property, known as derivative or non-prima facie contraband. The property seized is innocent and is only subject to forfeiture as a result of its association with unlawful activity. Ibid. The statute authorizes forfeiture of "[p]roperty which has become or is intended to become an integral part of illegal activity, including, but not limited to, money which is earmarked for use as financing for an illegal gambling enterprise." N.J.S.A. 2C:64-1(a)(3). Unlike the first category of property, the forfeiture of this property is not accomplished upon seizure. To enforce forfeiture of derivative contraband, "the State must bring a civil action within ninety days of the seizure against the property sought to be

forfeited," Seven Thousand Dollars, supra, 136 N.J. at 233 (citing N.J.S.A. 2C:64-3(a)), and prove a direct, causal connection between the seized property and the unlawful activity by a preponderance of the evidence. Id. at 234-35.

The court then conducts a fact-specific analysis to determine whether the State has established a direct, causal connection between the seized property and unlawful activity by a preponderance of the evidence. Id. at 238; State v. One (1) 1979 Chevrolet Camaro Z-28, 202 N.J. Super. 222, 230 (App. Div. 1985). Once the State satisfies this evidentiary threshold, "the burden shifts to the person challenging the forfeiture, the 'owner,' to show what portion of the money, if any, the court should ascribe to legitimate uses." Seven Thousand Dollars, supra, 136 N.J. at 238. "If the owner presents sufficient credible evidence to allocate the funds between illegal and legal purposes, the court must limit forfeiture to only those funds connected with the illegal activity." Ibid.

Although the "unlawful activity" relied upon must be an indictable crime rather than a disorderly persons offense, Seven Thousand Dollars, supra, 136 N.J. at 233 (citing One (1) 1979 Chevrolet Camaro Z-28, supra, 202 N.J. Super. at 229-30), the statute does not require that someone be convicted or even charged with an indictable offense as a prerequisite to

forfeiture.  Id. at 233-34; see also N.J.S.A. 2C:64-4(b) ("The fact that a prosecution involving seized property terminates without a conviction does not preclude forfeiture proceedings against the property. . . .").  "The absence of a requirement that a person be charged with a crime before forfeiture is allowed is consistent with the underlying nature of civil forfeiture actions as being directed at the property itself and not at any person."  Seven Thousand Dollars, supra, 136 N.J. at 234.  Moreover, the unlawful activity may only be "an intended but not-yet-committed offense" or one committed in the past.  Ibid.

IV.

Claimants admit that Bovery "operated sports pools" but deny that such pools were "illegal."  We disagree.

A.

N.J.S.A. 2C:37-1(b) defines gambling as "staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the actor's control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome." The definition of a "contest of chance" includes "any . . . game [or] pool . . . in which the outcome depends in a material degree upon an element of chance, notwithstanding that skill of

the contestants or some other persons may also be a factor therein." N.J.S.A. 2C:37-1(a).

Bovery's own statements regarding how the pools operated establish that the pools fall within the statutory definition of gambling. Players risked money, "something of value," on the outcome of various sports games which qualify as "future contingent events not under the actor's control," with the understanding that the player who makes the most correct picks will "receive something of value," money, at the conclusion of the season or when all other participants have been eliminated from the pool. See N.J.S.A. 2C:37-1(b). As the definition of a "contest of chance" makes clear, the fact that the skill of the athletes is a factor in the outcomes of the games or that the pool participants' acumen in predicting outcomes may play a role in the success of their picks is of no consequence.

New Jersey has a "clear and longstanding" "comprehensive policy against gambling (except where specifically authorized by the people)." Carll & Ramagosa, Inc. v. Ash, 23 N.J. 436, 445 (1957); Boardwalk Regency Corp. v. Attorney Gen. of N.J., 188 N.J. Super. 372, 376 (Law Div. 1982). The New Jersey Constitution prohibits the Legislature from authorizing gambling except through referendum and several constitutionally-established exceptions, which include the State lottery, casinos

in Atlantic City, horse racing, and certain raffles conducted by charities and religious organizations. N.J. Const. art. IV, § VII, ¶ 2.

Although sports pools may be popular and even considered blameless activities by the general population, it is clear those operated by Bovery do not fall within any of these exceptions. Because these sports pools are a form of gambling that is not sanctioned by the New Jersey Constitution, they are illegal.

### B.

We next review the evidence to determine whether the State met its initial burden of showing by a preponderance of the evidence that (1) there was a direct causal connection between the money seized and the promotion of gambling and (2) the promotion of gambling involved constituted an indictable offense under N.J.S.A. 2C:37-2.

N.J.S.A. 2C:37-2(a) defines the offense of promoting gambling and states in pertinent part:

> A person is guilty of promoting gambling when he knowingly:
>
> (1) Accepts or receives money or other property, pursuant to an agreement or understanding with any person whereby he participates or will participate in the proceeds of gambling activity; or

> (2) Engages in conduct, which materially aids any form of gambling activity. Such conduct includes but is not limited to conduct directed toward the creation or establishment of the particular game, contest, scheme, device or activity involved, toward the acquisition or maintenance of premises, paraphernalia, equipment or apparatus therefor, toward the solicitation or inducement of persons to participate therein, toward the actual conduct of the playing phases thereof, toward the arrangement of any of its financial or recording phases, or toward any other phase of its operation.

The required connection to illegal activity may be established by "admitted past or planned illegal activity." Seven Thousand Dollars, supra, 136 N.J. at 235. Bovery's admissions regarding his past activity and what was planned for the money seized from the bank accounts provide the required connection to the offense of promoting gambling under both subsections.

First, it is undisputed that Bovery received entry fees from the players and "sometimes received optional gifts from the participants of the pools" of approximately ten percent of the entry fees or winnings. He received the money pursuant to an agreement with the players that he would pool the funds received and distribute winnings according to the procedures he identified on his website. These admitted acts amounted to participation in the proceeds of gambling activity, in violation

18                                                    A-0703-14T2

of N.J.S.A. 2C:37-2(a)(1). Bovery's contention that the gifts were "optional" does not immunize his conduct. In determining whether conduct constitutes promotion of gambling, "it matters not whether [a defendant] was compensated by a stipulated percentage of the wager, or whether he received . . . 'voluntary contributions' from the players." Chomatopoulos v. Roma DeNotte Soc. Club, 212 N.J. Super. 447, 450 (Law Div. 1985).

Second, it is undisputed that Bovery organized a number of different types of sports survival pools using both his own website and a third-party website. He induced participation in his pools by posting messages on his website and by sending emails to prospective participants. This conduct materially aided the sports pool, a form of gambling activity, in violation of N.J.S.A. 2C:37-2(a)(2).

The next question is whether Bovery's activities rose to the level of an indictable offense. N.J.S.A. 2C:37-2(b) establishes the grading for this offense. Promoting gambling is a disorderly persons offense unless certain criteria are met. By "[e]ngaging in bookmaking to the extent he receives or accepts in any one day more than five bets totaling more than $1,000.00," a person is guilty of a third-degree offense.

N.J.S.A. 2C:37-2(b)(1).[8] One who "engag[es] in bookmaking to the extent he receives or accepts three or more bets in any two-week period" is guilty of a fourth-degree offense. N.J.S.A. 2C:37-2(b). Bookmaking is defined as "advancing gambling activity by unlawfully accepting bets[9] from members of the public upon the outcome of future contingent events as a business." N.J.S.A. 2C:37-1(g).

Claimants argue that Bovery "did not accept a bet because he had no financial stake in the outcome of any pools he managed." This argument seeks to superimpose a requirement not present in the plain language of the statute — that to be guilty of promoting gambling, one must have a personal stake in whether a specific bet wins or loses. We reject this argument.

Claimants cite no legal authority to support their interpretation and, in fact, the factual premise for the argument is substantially undermined by Bovery's testimony that

---

[8]  N.J.S.A. 2C:37-2(b)(2) provides an alternative basis for promoting gambling to constitute a third-degree offense that is inapplicable here.

[9]  Because "bet" is not defined in the statute, we give the word its "ordinary meaning and significance." State v. Tate, 220 N.J. 393, 409 (2015) (citation omitted). Black's Law Dictionary defines a bet as "[s]omething of value (esp. money) staked or pledged as a wager," Black's Law Dictionary 144 (9th ed. 2010), and wager as "[m]oney or other consideration risked on an uncertain event." Id. at 1355.

he accepted responsibility for covering the bets or entry fees for persons who did not pay them. He stated he lost $3000 to $5000 per year in collections because it was not his practice to reduce the pot won by the amount of the entry fees players failed to pay; that he would "eat the losses" and write off "deadbeats."[10]

Alternatively, claimants seek to define a bet as "where a player selected what they believed would be a winning team" and argue that here, because the money was seized prior to the commencement of the football season — no bets had yet been placed. Claimants maintain that "for a bet to take place, an amount must be staked on a particular outcome and the player must also select a side of an event." According to claimants, at the time the funds were seized, players had either not chosen a team, had chosen a team but could change their team choice, or could "decide not to play and request and receive a refund." This argument also fails to create a factual issue that will withstand summary judgment.

As we have noted, to establish the required nexus to illegal activity, the State does not have to establish that the seized funds constitute evidence that a crime has been

---

[10] A balance sheet seized from claimants' residence during the execution of the search warrant included an entry for "deadbeats cushion" of $4000.

committed. The connection to illegal activity may be satisfied by showing the funds' relationship to prior offenses or activity that is planned and never comes to fruition. Seven Thousand Dollars, supra, 136 N.J. at 234. Proof that the money seized was "intended to become an integral part of . . . an illegal gambling enterprise" was sufficient. N.J.S.A. 2C:64-1(a)(3).

That standard was met here. The identification of over $700,000 of the money seized as the entry fees for the 2010 football pool provided ample proof of a connection to an illegal gambling enterprise and Bovery's admissions regarding his prior, longstanding involvement in sports pools provided that connection for the seized funds that were described as personal.

The record provides ample proof that the promoting gambling conduct here rose to the level of an indictable offense. During the 2009 to 2010 "pool cycle," Bovery collected over $1.7 million in pool entry fees ranging from $20 to $100. By way of example, on September 7, 2010, Bovery made three deposits of $36,800, $47,190 and $43,165 into Account -2. The $36,800 deposit consisted of eleven checks or money orders representing player "entry fees." On the same date, he made two deposits to Account -4, of $29,630 and $48,105, the latter deposit consisting of ninety-six checks and money orders. These entry fees constituted the "something of value" each player "stak[ed]

or risk[ed] . . . upon the outcome of a contest of chance or a future contingent event not under the actor's control or influence," within the definition of gambling in N.J.S.A. 2C:37-1(b). These admitted transactions are ample proof of an indictable offense.

We therefore conclude the State met its initial burden of proving by a preponderance of the evidence that there was a direct causal connection between the seized funds and an indictable offense.

V.

We next turn to whether the court erred in failing to allocate the funds between illegal and legal purposes. As we have noted, forfeiture will be limited to those funds connected with the illegal activity "[i]f the owner presents sufficient credible evidence to allocate the funds between illegal and legal purposes." Seven Thousand Dollars, supra, 136 N.J. at 238. The record includes a copy of claimants' W-2s for 2010, which report income of approximately $47,000 from their employment. Claimants argue the State was required to conduct "a forensic accounting of the entire $846,000 going in and out of these accounts" to segregate the funds obtained through their employment. However, it was claimants' burden to present this argument and supporting evidence if they were to withstand

summary judgment. Once the State made the initial requisite showing, the burden shifted to claimants "to show what portion of the money, if any, the court should ascribe to legitimate uses." Ibid. They failed to do so and did not raise this argument until they filed their motion for reconsideration.

As the State argues, claimants did not dispute that Bovery's bank records and deposition testimony reveal that from October 5, 2009 through January 4, 2010, he transferred at least $43,679 of proceeds or "gifts" from his sports pools from Account -2 and Account -4 to the "personal account." The State reasons that because the amount in claimants' "personal" account at the time of the seizure, $17,950.14, was less than the $43,679 in pool proceeds Bovery transferred into that account, claimants are foreclosed from arguing that any of the $17,950.14 seized constituted legitimate W-2 income, not linked to illegal activity. Therefore, it is argued, the seizure of the contents of the entire account was proper. See State v. Sparano, 249 N.J. Super. 411, 427 (App. Div. 1991) ("[T]here need not be a 'direct' connection between racketeering profits and the acquired property sought to be forfeited, so long as the State proves that the property was acquired by funds equivalent to the fruits of the criminal activity.").

Our review of the record reveals that claimants failed to present a genuine issue of fact that an identifiable amount of the money seized was attributable to a legitimate source. Pursuant to Rule 4:46-2(a), the State prepared a Statement of Undisputed Facts in support of its motion for summary judgment. As required by the rule, the state's factual assertions were supported by citations to the record, which included Bovery's testimony, claimants' discovery responses and other documentation.

Paragraph 155 asserted that all the funds retained in Account -2 and Account -4 "represent[ed] either funds collected by [Bovery] as entry fees . . . or funds received/retained by [Bovery] in the form of 'gifts' from pools participants." Because claimants offered no response to this paragraph, the facts contained therein were deemed admitted pursuant to Rule 4:46-2(b).

Paragraph 189 asserted that "at least $43,679" in sports pool "gifts" was transferred from the "pool" accounts into claimants' "personal" account. Claimants also failed to refute the facts contained in this paragraph, thereby admitting the assertions pursuant to Rule 4:46-2(b).

Claimants also presented no response to paragraphs in the State's Statement of Undisputed Facts that asserted checks from

25

Account -2 and Account -4, the accounts used primarily for the pools, were used to pay personal expenses such as their mortgage, their daughters' college tuition and Bovery's credit card, that checks were drawn made payable to "cash" or to Bovery, and at least one check drawn on a "pool" account was deposited into Account -5.

Paragraph 186 of the State's Statement of Undisputed Facts asserts that at the time of seizure, Account -2 and Account -4 held "$760,055 in funds derived as entry fees collected from pool participants." Paragraph 189 asserted Bovery's "records, prior statements, and sworn testimony and admissions discussed supra show that [Bovery] also transferred at least $43,679 of the 'gifts' . . . from Accounts Nos. []-2 and []-4 into Account No. []-5, the account [Bovery] held jointly with" Mary Bovery.

Claimants offered no response to Paragraph 189 and, in response to Paragraph 186, merely supported their denial by saying, "The calculations are incorrect. See balance sheet attached to the State's Motion for Summary Judgment as Exhibit 3." That "balance sheet," bearing a date of August 21, 2010, was seized from claimants' home pursuant to the search warrant and appears to be prepared by Bovery. It lists the assets in "our checking" as $19,452.27 and "john pay 10/11 school year pending bank deposit" as $1200.

26

In short, claimants' responses to the State's Statement of Undisputed Facts were inadequate to create a genuine issue of fact, see R. 4:46-2(b), much less satisfy claimants' burden to present "sufficient credible evidence to allocate the funds between illegal and legal purposes." Seven Thousand Dollars, supra, 136 N.J. at 238.

## VI.

In Point II, claimants argue the State violated the notice provision of N.J.S.A. 2C:64-3 because it failed to provide notice to the players whose entry fees were seized and that, as a result, the trial court erred in ruling to the contrary. They argue the players had an affirmative defense to the forfeiture of their funds because N.J.S.A. 2C:37-2(c) excludes players from prosecution for promoting gambling. They contend that, because the players committed no crime, the seizure of the money they paid as entry fees "violates notions of fundamental fairness." This argument merits only limited comment. R. 2:11-3(e)(1)(E).[11]

The State was required to provide notice of the forfeiture action "to any person known to have a property interest in the" property sought to be forfeited. N.J.S.A. 2C:64-3(c) (emphasis added). The persons known to have a property interest in the

---

[11] We therefore need not address the standing issue raised by the State and decided by the trial court.

A-0703-14T2

accounts that were seized were the account holders: Bovery, his wife and his father. Each was given notice. The entry fees were not segregated into separate accounts for each player; no player was an account holder. Therefore, the notice provided by the State adequately complied with the statutory provision.

We note further that claimants' argument rests upon a faulty premise — that the State's right to forfeiture depends upon the players' guilt of an offense. As we have noted, a forfeiture action is brought against the property itself, and not its owner or possessor because the theory of forfeiture is based on "the misuse of the property." See Seven Thousand Dollars, supra, 136 N.J. at 232-33 (citation omitted). Civil forfeiture is permitted for property that is intended to become part of illegal activity and requires neither criminal conduct nor a conviction. See id. at 234.[12] The fact that the players committed no crime is therefore of no import. See id. at 233-34.

---

[12] In interpreting a prior forfeiture statute, the Supreme Court stated "all property used for gambling was contraband, and such property was construed to include all money earmarked and segregated as part of a gambling operation." Spagnuolo v. Bonnet, 16 N.J. 546, 558 (1954). The Court stated further that the statute "could not be intended to have the effect of leaving the legal title to such money in the gambler or player." Ibid. Claimants contend the trial court's reliance upon Spagnuolo was flawed because the earlier statute did not include a notice provision like that in the present statute. We are unpersuaded by this argument.

Even if the players could be considered owners of the funds held in the accounts under others' names, the players' defense to the criminal offense does not equate with a defense to the forfeiture of the funds they paid to Bovery. N.J.S.A. 2C:64-5(b) provides an "innocent owner" defense and states that property seized pursuant to the civil forfeiture statute will not be subject to forfeiture "if the owner of the property establishes by a preponderance of the evidence that the owner was not involved in or aware of the unlawful activity and that the owner had done all that could reasonably be expected to prevent the proscribed use of the property by an agent." See also State v. One (1) Ford Van, Econoline, 154 N.J. Super. 326, 329-30 (App. Div. 1977), certif. denied, 77 N.J. 474 (1978). It is beyond cavil that the players who paid entry fees to participate in Bovery's sports pools were aware of the unlawful activity that provided the basis for forfeiture.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0703-14T2